UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EVA MARIE SANTOS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>MINNESOTA LIFE INSURANCE COMPANY,<br><br>　　　　　Defendant. | Case No. 20-cv-06707-PJH<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR JUDGMENT AND DENYING DEFENDANT'S MOTION FOR JUDGMENT**<br><br>Re: Dkt. Nos. 49, 50 |

Plaintiff and defendants' cross-motions for judgment under Federal Rule of Civil Procedure 52 came on for hearing before this court on October 7, 2021. Plaintiff appeared through her counsel, Lee Harris and Adrian Hern. Defendant appeared through its counsel, Charan Higbee. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby rules as follows.

**I.   FINDINGS OF FACT**

This is an ERISA case. Samuel Chong ("decedent" or "insured") was a fifty-five-year-old engineer and employee of Apple, Inc. Plaintiff Eva Marie Santos, Chong's cousin, brings this action in her capacity as the administrator of his estate. Defendant Minnesota Life Insurance Company (also known as Securian Financial Group, Inc.) issued a group insurance policy for accidental death of Apple employees, including Chong.

**A.   The Insured's Death**

On February 2, 2018, Chong was found deceased in his home during a well-being

check by the San Francisco Police, after he was a "no show" at work and missed a psychotherapy appointment a few days prior. ML 114 (Dkt. 49-1 at 117).[1] He was found on the floor in the kitchen, near a table. ML 115 (Dkt. 49-1 at 118). The gas oven door was found open, but the oven was not in use at the time Chong was discovered. ML 115 (Dkt. 49-1 at 118). Blood was noted near his head and flowed a short distance from the body. ML 115 (Dkt. 49-1 at 118). There also was dried vomit near his head. ML 115 (Dkt. 49-1 at 118).

The autopsy report lists the cause of death as blunt force head trauma with subdural hematoma consistent with a fall to the back of the head. ML 126 (Dkt. 49-1 at 129). Under the category "contributing," "methamphetamine present" is listed. ML 126 (Dkt. 49-1 at 129). The manner of death is listed as "accident." ML 126 (Dkt. 49-1 at 129). The comment section of the report states:

> The autopsy findings are most consistent with a mechanism of injury from a fall to the back of the head in an individual under the influence of methamphetamine. There are no additional injuries that would suggest the involvement of a second party.

ML 126 (Dkt. 49-1 at 129). The toxicology report found methamphetamine, amphetamine, and Temazepam present in the decedent's blood and urine. ML 128 (Dkt. 49-1 at 131). The level of methamphetamine in the blood sample was 2258 ng/mL, and the level of amphetamine was 307 ng/mL. ML 128 (Dkt. 49-1 at 131).

The corrected death certificate lists the immediate cause of death as blunt force head trauma with subdural hematoma. ML 209-10 (Dkt. 49-1 at 212-13). The section for "other significant conditions contributing to the death but not resulting in the underlying cause" notes "methamphetamine present." ML 209-10 (Dkt. 49-1 at 212-13). In the section describing how injury occurred (events which resulted in injury), the death certificate lists "drug related." ML 209-10 (Dkt. 49-1 at 212-13). The death certificate

---

[1] The citation designation "ML" denotes the Minnesota Life Bates number of the documents in the administrative record. The court's Bates number citations omit preceding zeros.

1  provides a series of check boxes regarding the available options for manner of death,
2  including "natural," "accident," "homicide," "suicide," "pending investigation," and "could
3  not be determined." ML 209 (Dkt. 49-1 at 212). From these options, the manner of
4  Chong's death is "accident." ML 209-10 (Dkt. 49-1 at 212-13).

Chong had a history of manic-depressive psychosis, a long history of methamphetamine abuse with past rehabilitation, and many years of psychotherapy. ML 114-15 (Dkt. 49-1 at 117). His psychotherapist reported Chong had a long-standing methamphetamine addiction, chronic suicidal ideations, and depression. ML 115, 117 (Dkt. 49-1 at 118, 120). No notes were found in the residence. ML 115 (Dkt. 49-1 at 118). Chong's physician would later certify that he "did not ever prescribe methamphetamine or its FDA approved brand-name medication Desoxyn" to the decedent. ML 218 (Dkt. 49-1 at 221).

### B.   The Life Insurance Policy

At the time of his death, Chong was covered under two group insurance policies issued by Minnesota Life to Apple. Group Term Life Insurance Policy No. 34017-G provided a basic life insurance death benefit of $311,000 for the insured. ML 15, 28, and 335-408 (Dkt. 49-1 at 18, 31, and 338-411). Group Accidental Death and Dismemberment Policy No. 33957-G issued by Minnesota Life to Apple ("the Policy") provided an accidental death benefit in the amount of $311,000 for the insured (i.e. twice his annual salary). ML 26, 28 (Dkt. 49-1 at 29, 31). The basic life insurance death benefit was already paid by defendant to plaintiff—only the accidental death benefit is the subject of plaintiff's complaint in this action.

The Policy's accidental death benefit is to be paid "upon receipt at our home office of written proof satisfactory to us that you died . . . as a result of a covered accidental injury." ML 73 (Dkt. 49-1 at 76). The Policy contains the following definition:

> Accidental death or dismemberment by accidental injury means that an insured's death or dismemberment results, directly and independently of all other causes, from an accidental injury which is unintended, unexpected, and unforeseen.

3

1  ML 72 (Dkt. 49-1 at 75).

2  The Policy contains specific exclusions.  Relevant to this case and Chong's death,
3  the Policy states:

> In no event will we pay the accidental death or dismemberment benefit where the insured's death or dismemberment results from or is caused directly or indirectly by any of the following:
> . . .
> (7) being under the influence of any prescription drug, narcotic, or hallucinogen, unless such prescription drug, narcotic, or hallucinogen was prescribed by a physician and taken in accordance with the prescribed dosage.

ML 74 (Dkt. 49-1 at 77).  This exclusion hereinafter is referred to as the "drug exclusion."

### C. Defendant's Denial of Claim for Accidental Death Benefits

Plaintiff, as the administrator of the estate, submitted an initial beneficiary statement to Minnesota Life in March 2018.  ML 33-34, 143 (Dkt. 49-1 at 36-37, 146).  By letter dated November 16, 2018, Minnesota Life informed plaintiff that the claim for the basic life insurance benefit in the amount of $311,000 had been approved.  ML 90-91 (Dkt. 49-1 at 93-94).

Minnesota Life continued to process the claim for the accidental death benefit.  An Associate Medical Director for Minnesota Life, Dr. Shapland, issued a medical opinion on December 17, 2018, wherein she reported that the usual and customary dose for methamphetamine is 15 mg per day and Chong's methamphetamine level was 70.6 times higher and within the "fatal" range.  ML 24, 25 and 313 (Dkt. 49-1 at 27, 28, and 316).  Based on the probability that the methamphetamine in Chong's system led to toxic effects, she opined that the methamphetamine ingestion was a contributory cause of his death.

Thereafter, Minnesota Life denied plaintiff's claim for accidental death benefit, stating in a letter that Chong's methamphetamine level of 2258 ng/mL was "in the fatal range," and suggesting that the death was the result of an overdose.  ML 137-139 (Dkt. 49-1 at 140-142).

Plaintiff submitted an administrative appeal of Minnesota Life's decision and an

1  appeal letter dated May 16, 2019.  ML 142-144, 175-181 (Dkt. 49-1 at 145-47, 178-184).
2  In reviewing plaintiff's administrative appeal, Minnesota Life obtained a medical opinion
3  from another of its Associate Medical Directors, Dr. Motlhatlhedi.  ML 313 (Dkt. 49-1 at
4  316).  Dr. Motlhatlhedi's opinion reiterated that Chong's methamphetamine level (2258
5  ng/mL) was in the fatal range and "contributed to the fall" as well as to his death.  ML 20-
6  21 (Dkt. 49-1 at 23-24).

7  Finally, Minnesota Life affirmed its denial of accidental death benefit by letter sent
8  to plaintiff's attorney on July 10, 2019.  ML 313-14 (Dkt. 49-1 at 316-17).

### D. Procedural History

Plaintiff initiated this lawsuit by complaint filed on September 24, 2020, alleging two causes of action: (1) recovery of ERISA AD&D plan benefits, the $311,000 accidental death benefit under the Policy, and (2) penalties for failure to properly provide the claims file.  Dkt. 1.  By stipulation, the complaint was dismissed as to originally named defendants Apple, Inc., and Apple Inc. Health and Welfare Benefit Plan.  Dkt. 28.  The second cause of action was dismissed in the same stipulation.  Dkt. 28.  The parties' agreement left standing only the first cause of action for recovery of ERISA AD&D plan benefits alleged against Minnesota Life.

The parties stipulated that the de novo standard of review applies to the court's review of Minnesota Life's claim determination. Dkt. 36.

The parties filed the cross-motions now at issue on August 5, 2021, both seeking judgment pursuant to Federal Rule of Civil Procedure 52.[2]  Dkt. 49, 50.  In plaintiff's motion, she requests an award of benefits under the policy, attorneys' fees, costs, and prejudgment interest at a rate of seven percent (7%).

## II. REQUESTS FOR JUDICIAL NOTICE

Both defendant and plaintiff submit requests for judicial notice ("RJN"), asking the court to consider certain documents outside the administrative record.

---

[2] Plaintiff's counsel clarified that a citation to Rule 56 in the papers was made in error—at the hearing, counsel stated her intent to seek judgment under Rule 52.

### 1. Legal Standard

The court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Matters of public record may be judicially noticed, but disputed facts contained in those records may not. Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 999 (9th Cir. 2018). In Khoja, the Ninth Circuit clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. Id. Courts in this circuit routinely take judicial notice of material contained on government agency websites. See, e.g., Daniels-Hall v. Nat'l Educ. Ass'n, 629 F.3d 992, 998-99 (9th Cir. 2010); Buffin v. City and Cty. of San Francisco, No. 15-cv-04959-YGR, 2019 WL 1017537, at *10 n.29 (N.D. Cal. Mar. 4, 2019) ("a court can take judicial notice of public records and government documents available from reliable sources on the Internet, such as websites run by government agencies") (cleaned up); Am. Civil Liberties Union of N. California v. Azar, No. 16-cv-03539-LB, 2018 WL 4945321, at *3 n.17 (N.D. Cal. Oct. 11, 2018) ("As a matter of public record, the court may take judicial notice of information on government websites that is not reasonably subject to dispute.").

### 2. Defendant's RJN

Defendant requests that the court take notice of the drug label information for the pharmaceutical drug Desoxyn obtained through the website of the National Institutes of Health ("NIH"). Dkt. 49-3. In support of this request, defendant cites two cases in which district courts took judicial notice of the content of government websites as reliable sources. Gerritsen v. Warner Bros. Entertainment Inc., 112 F.Supp.3d 1011, 1033-1034 (C.D. Cal. 2015) ("Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies"); Ogden v. Bumble Bee Foods, LLC, No. 5:12-CV-01828-LHK, 2014 WL 27527 at *8 n.6 (N.D. Cal. Jan. 2, 2014).

In her opposition brief, plaintiff objects to the drug label information as evidence

1  outside the administrative record.  External evidence is considered in de novo review of

2  ERISA cases *only* where circumstances clearly establish that additional evidence is

3  necessary to conduct an adequate review of the benefit decision.  Opeta v. Nw. Airlines

4  Pension Plan for Cont. Emps., 484 F.3d 1211, 1217 (9th Cir. 2007) (citing Mongeluzo v.

5  Baxter Travenol Long Term Disability Ben. Plan, 46 F.3d 938, 943-44 (9th Cir. 1995)).

       **3.**     **Plaintiff's RJN**

Plaintiff submits two documents titled requests for judicial notice.  Both are combined with declarations of counsel.  The RJN/declaration submitted alongside plaintiff's motion includes the administrative record.  Dkt. 51.  The RJN/declaration submitted alongside plaintiff's opposition brief includes (1) a copy of Winek's Drug and Chemical Blood-Level Data 2001 and (2) a copy of the NIH Webpage on Methamphetamine Drug Facts.  Dkt. 53-1.

Defendant objects to the Winek chart but not the website.  Dkt. 55.  Defendant's objection to the Winek chart focuses on the potential inaccuracy of the data.  The information is subject to reasonable dispute, defendant points out, because the very author of the article acknowledges that the values in the chart "are not considered absolute."  Dkt. 53-1 at 8.

       **4.**     **Analysis**

Here, the parties agree that the standard of review is de novo (stipulation at Dkt. 36), and if de novo review applies, "[t]he court simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits."  Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 963 (9th Cir. 2006).  However, as discussed more in depth below, the court faces some difficulty in assessing the ordinary and popular understandings of certain terms in defendant's policy.  Additional evidence is necessary to conduct an adequate review of the benefit decision, particularly regarding the applicability of the policy's drug exclusion.  The court thus finds it necessary and appropriate to consider the parties' submissions of government webpages in its assessment of the ordinary and popular meaning of certain drug terms.  Dkt. 49-3 at 4 (Desoxyn); Dkt. 53-1 at 26-34

(methamphetamine).

On the other hand, the court denies plaintiff's request that the court take notice of the Winek chart because the document acknowledges its own lack of reliability: "The values are not considered absolute, but are to be used as a guide in evaluating a given case. The values can be affected by dose, route of administration, absorption differences, age and sex, tolerance, method of analysis, pathological or disease state, postmortem redistribution, etc." Charles L. Winek et al., Winek's Drug & Chemical Blood-Level Data 2001 (Dkt. 53-1 at 8). The accuracy of this source can thus reasonably be questioned, and it is not an appropriate subject of judicial notice where it was not considered in the administrative record.

The court therefore GRANTS the requests for judicial notice of the NIH webpages. The court DENIES the request for judicial notice of the Winek Chart, and that document is excluded.

## III.  CONCLUSIONS OF LAW

### A.  Legal Standard

Under ERISA § 502, a beneficiary or plan participant may sue in federal court "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); see also CIGNA Corp. v. Amara, 131 S.Ct. 1866, 1871 (2011); Aetna Health Inc. v. Davila, 542 U.S. 200, 210 (2004).

A claim of denial of benefits in an ERISA case is to be reviewed "under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989); Montour v. Hartford Life & Acc. Ins. Co., 588 F.3d 623, 629 (9th Cir. 2009). De novo review means that the court "considers the matter anew, as if no decision had been rendered." Dawson v. Marshall, 561 F.3d 930, 932-33 (9th Cir. 2009). Here, the parties have agreed that review is de novo, and each side's argument regarding judgment is considered under Rule 52.

Rule 52(a) provides, in part, that "[i]n an action tried on the facts without a jury . . ., the court must find the facts specially and state the conclusions of law separately." The findings "may be stated on the record after the close of evidence, or may appear in an opinion or a memorandum of decision filed by the court." Fed. R. Civ. P. 52(a)(1). In ERISA cases, it is common for parties to bring cross-motions for summary judgment under Rule 52, in which case the court conducts a de novo review of the plan administrator's decision denying benefits, see Lee v. Kaiser Found. Health Plan Long Term Disability Plan, 2012 WL 664733 at *2 & n.4 (N.D.Cal. Feb. 28, 2012), which is to say that "the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." Caplan v. CNA Fin. Corp., 544 F.Supp.2d 984, 990 (N.D.Cal. 2008) (citing Kearney v. Standard Ins. Co., 175 F.3d 1084, 1094-95 (9th Cir. 1999)).

In a de novo review of a plan administrator's decision, "the burden of proof is placed on the clamant" to establish his/her entitlement to benefits. Muniz v. Amec Constr. Mgmt. Inc., 623 F.3d 1290, 1294 (9th Cir. 2010); see also Inciong v. Fort Dearborn Life Ins. Co., 570 Fed. Appx. 724, 725 (9th Cir. 2014). When conducting de novo review of a decision by an ERISA plan administrator, the court must undertake an independent and thorough inspection of the decision. See Silver v. Executive Car Leasing Long-Term Disability Plan, 466 F.3d 727, 733 (9th Cir. 2006). The court then "proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits" based on the evidence in the administrative record. Abatie, 458 F.3d at 963; see also Firestone, 489 U.S. at 115.

"When faced with questions of insurance policy interpretation under ERISA, federal courts should apply federal common law." Padfield v. AIG Life Ins. Co., 290 F.3d 1121, 1125 (9th Cir. 2002) (citing Firestone, 489 U.S. at 110). "Under the federal common law of ERISA, we 'interpret terms in ERISA insurance policies in an ordinary and popular sense as would a person of average intelligence and experience.'" Padfield, 290 F.3d at 1125 (quoting Babikian v. Paul Revere Life Ins. Co., 63 F.3d 837, 840 (9th

Cir.1995)).

**B.    Analysis**

The parties' cross-motions center on (1) whether Chong's death was an accident, and (2) assuming Chong's death was an accident, whether it falls within the policy's drug exclusion. These two issues are considered in turn.

**1.    Accident**

Following the federal common law assessment of "accident," the court is obligated to apply the test mandated by the Ninth Circuit:

> A death or injury may be "deemed 'accidental' under a group accidental insurance policy established under ERISA if the death [or injury] was unexpected or unintentional." 10 Couch on Insurance § 139:16 (3d ed. 1995 & 2000 Supp.). In determining whether death, or the injury that caused death, was unexpected or unintentional, courts have undertaken an overlapping subjective and objective inquiry. The court first asks whether the insured subjectively lacked an expectation of death or injury. See Wickman v. Northwestern Nat'l Ins. Co., 908 F.2d 1077, 1088 (1st Cir.1990) ("Requiring an analysis from the perspective of the reasonable person in the shoes of the insured fulfills the axiom that accident should be judged from the perspective of the insured."). If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. See id. If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

Padfield, 290 F.3d at 1126. In Padfield, the insured was found dead on the back seat floor of his minivan following what the coroner concluded was the accidental result of autoerotic asphyxiation. See 290 F.3d at 1123-24. The insurer argued that the death was not accidental, invoked the suicide exclusion contained within the accidental death policy, and denied the claim. Id. at 1124. Another district court summarized the resulting proceedings as follows:

> The district court concluded that the death was caused by an intentionally self-inflicted injury and therefore not covered by policy. In reversing, the Ninth Circuit looked to the reasonable

10

> expectations of the insured and asked whether the conduct at issue was substantially certain to result in death. The undisputed evidence revealed that autoerotic asphyxiation is intended to heighten sexual arousal, generally reflects behavior engaged in over a period of years and "the intent of the individuals performing this act is not death." Id. at 1126-27. Noting that death by autoerotic asphyxiation is statistically rare, the Ninth Circuit concluded that Mr. Padfield's death was accidental and therefore a covered event under the accidental death policy.

Brettelle v. Life Ins. Co. of N. Am., 691 F. Supp. 2d 1249, 1252-53 (S.D. Cal. 2010).

Here, the administrative record establishes at least on a prima facie level that Chong's death was an accident. The medical examiner determined that the death was an accident, investigators found no evidence of an intentional overdose or suicide attempt, and there was no evidence of a second party or foul play. Chong was found dead in his apartment after he missed work and personal appointments. The record here does not support a determination that the insured "did anything other than make a fatal mistake." Santaella v. Metro. Life Ins. Co., 123 F.3d 456, 465 (7th Cir. 1997). Plaintiff has established by a preponderance of evidence that Chong's death was an accident.

The administrative record here gives no indication of Chong's subjective expectations and, accordingly, the objective inquiry guides the court's assessment. The court thus considers whether a reasonable person, with the background and characteristics of Chong, would have viewed the injury as highly likely to occur as a result of his intentional conduct. The administrative record affords no evidence supporting Minnesota Life's theory—that a reasonable 55-year-old engineer with a documented history of methamphetamine use views death or serious injury as the substantially certain result of ingesting methamphetamine. A reasonable person with Chong's background and characteristics may indeed know that taking methamphetamine is likely to have side effects, including the dizziness or restlessness noted in the administrative record. Dkt. 49-1 at 23. A reasonable person with Chong's background and characteristics may even have knowledge that death is a possible risk of ingesting excessive amounts of methamphetamine. Knowledge of a potential consequence, however, does not equate with knowledge of a substantially certain result. As noted by the Ninth Circuit, "voluntary

11

risky acts resulting in injury are not necessarily acts that result in 'intentionally self-inflicted injury.'" Padfield, 290 F.3d at 1129-30.

Defendant advances that the only objectively reasonable conclusion to draw from Chong's ingestion of a dangerous drug is that his fall and death was substantially certain to result, but that runs directly counter to the reasoning in Padfield. Defendant's argument more closely matches the "accidental means" test where Minnesota Life asserts that Chong's intentional conduct meant that his injury was necessarily intentional as well. As noted in defendant's opposition brief, this approach no longer comports with federal ERISA common law, and it does not comport with the mixed subjective-objective assessment provided in Padfield. Dkt. 54 at 10.

Further, the cases cited by defendant for the proposition that death is a foreseeable result of illicit drug use are in a different position than the case at bar—they all review accidents under the deferential review owed under the abuse of discretion standard. Werbianskyj v. Zurich American Ins. Co., No. 3:15-CV-104, 2016 WL 4076367, at *8 (N.D. Ind. Aug. 1, 2016) ("In this case the parties agree that . . . the appropriate standard of review is a deferential one rather than de novo"); Cady v. Hartford Life & Accidental Ins. Co., 930 F. Supp. 2d 1216, 1230 (D. Idaho 2013) ("The Court will accordingly review Hartford's denial for abuse of discretion"). Those courts did not specifically hold that death is a foreseeable result of drug use; rather, they determined that the insurers did not abuse their discretion by interpreting their policies in that way. In contrast, in at least some cases to have considered foreseeability under a de novo standard, courts found that injuries influenced by a decedent's inebriation were not foreseeable. Brettelle, 691 F. Supp. 2d at 1254 (finding a death accidental where "death is not substantially certain to result in any particular case of driving a motorcycle at excessive speed (90 MPH) while impaired by an alcohol level between 0.05% and 0.10%").

Defendant's reviewing physicians suggested that the level of methamphetamine in Chong's system was in the fatal range, but all accounts confirm that Chong's death

resulted from a subdural hematoma caused by a fall, not an overdose, as Minnesota Life continuously hints. In a similar way to the autoerotic asphyxiation considered in Padfield, Chong's ingestion of methamphetamine generally reflected behavior engaged in over a period of years. Dkt. 49-1 at 118 ("The subject's therapist, who had followed the subject since 2003, relayed a history of bipolar disorder, long-standing methamphetamine addiction, chronic suicidal ideations, and depression"). Chong had a history of methamphetamine use, and there was no history in the record that he previously fell or required urgent medical attention. There is no evidence to suggest that Chong expected or foresaw falling in his apartment. There is nothing in the record to support that he (or other individuals habitually using methamphetamine) was substantially certain to die in this instance.

Therefore, the court concludes that the death was an accident.

### 2. Drug Exclusion

Again, the drug exclusion provides that the death benefit is not payable where the insured's death results from or is caused directly or indirectly by:

> being under the influence of any prescription drug, narcotic, or hallucinogen, unless such prescription drug, narcotic, or hallucinogen was prescribed by a physician and taken in accordance with the prescribed dosage.

ML 74 (Dkt. 49-1 at 77). The evidence in the record demonstrates that Chong's death was at least indirectly caused by being under the influence of methamphetamine. Dkt. 49-1 at 129 ("The autopsy findings are most consistent with a mechanism of injury from a fall to the back of the head in an individual under the influence of methamphetamine"). Methamphetamine was not prescribed to Chong by a physician. Dkt. 49-1 at 136-38 (list of decedent's prescriptions) and 221 (letter from Chong's physician stating that he did not prescribe methamphetamine or its pharmaceutical version to the decedent). Therefore, if methamphetamine can be characterized as a prescription drug, a narcotic, or hallucinogen, the drug exclusion should apply to prevent coverage.

Arguing that methamphetamine can be considered a prescription drug, Minnesota

Life expends significant effort to connect the methamphetamine in Chong's system to the prescription drug Desoxyn. However, the similarities between Desoxyn and the methamphetamine found in the decedent's system do not transform methamphetamine into a prescription drug, particularly where it was not prescribed by his physician. Dkt. 49-1 at 221. Where the court is to interpret terms in ERISA plans "in an ordinary and popular sense as would a person of average intelligence and experience," Padfield, 290 F.3d at 1125, methamphetamine simply does not fit the bill of a prescription drug. Defendant fails to meet its burden of establishing that the methamphetamine found in decedent's system should be characterized as a prescription drug because it only proposes that methamphetamine is *capable* of being prescribed in the form of Desoxyn, not that it is ordinarily known as a prescription drug. See Dkt. 49-3 at 5. The ordinary and popular understanding of prescription drug, in contrast, excludes the drug methamphetamine as it is described on the NIH website. Dkt. 53-1 at 27-34. The popular understanding of methamphetamine as an illicit drug, along with all of the circumstances surrounding Chong's ingestion of a significant amount of methamphetamine, suggest that methamphetamine is not a prescription drug and even if it was, there is no evidence that it was prescribed by a physician or taken in accordance with the prescribed dosage. Indeed, the evidence reflects the contrary.

Minnesota Life alternatively argues that methamphetamine qualifies as a narcotic where it fits the following common dictionary definition of narcotic: "a drug . . . subject to restriction similar to that of addictive narcotics whether physiologically addictive and narcotic or not."[3] Dkt. 49 at 23. But this circular definition, using the word narcotic to

---

[3] The full definition of the noun "narcotic" from Merriam-Webster provides:
> 1(a): a drug (such as opium or morphine) that in moderate doses dulls the senses, relieves pain, and induces profound sleep but in excessive doses causes stupor, coma, or convulsions
> (b): a drug (such as marijuana or LSD) subject to restriction similar to that of addictive narcotics whether physiologically (see PHYSIOLOGICAL) addictive and narcotic or not
> 2: something that soothes, relieves, or lulls

See *narcotic*, MERRIAM-WEBSTER DICTIONARY, available at https://www.merriam-

14

define narcotic, reveals that there is more to the picture.  Methamphetamine likely does not fit the other connotations of narcotic listed in the Merriam-Webster dictionary, as a drug that soothes or dulls.  The NIH webpage on methamphetamine describes the drug instead as a stimulant with none of the dulling characteristics described in the common dictionary definitions of narcotic.  Dkt. 52-1 at 27.  In one more point of departure, narcotics are listed separately under federal regulations as a Schedule III drug, while methamphetamine is specifically included in Schedule II.  21 C.F.R. § 1308.13(e).  Taking these considerations together, the court concludes that methamphetamine does not fall within the ordinary and popular definition of narcotic.

Minnesota Life additionally advances that methamphetamine fits within the term hallucinogen.  It reaches this conclusion primarily on the basis that overdose of Desoxyn may cause hallucinations, according to the Desoxyn drug label from the NIH website.  Dkt. 49-3 at 11.  Because the drug is capable of causing hallucinations when taken at the overdose level, defendant reasons, it fits the term hallucinogen in the ordinary and popular sense.  None of the reviewing physicians, including the medical examiner, concluded that Chong overdosed on methamphetamine.  Methamphetamine is not typically understood as a hallucinogen based solely on this extreme effect.  Instead, methamphetamine is commonly characterized as a stimulant, as noted above and including in the Code of Federal Regulations.  See 21 C.F.R. § 1308.12(d).  Hallucinogens are listed separately under Schedule II and do not include methamphetamine.  21 C.F.R. § 1308.12(f).  The court thus determines that methamphetamine does not fall within the ordinary and popular meaning of hallucinogen.

In sum, defendant fails to establish that the drug exclusion should apply to Chong's accidental death.  While he was found with significant levels of methamphetamine in his system, methamphetamine does not fit the commonly understood classifications of prescription drug, narcotic, or hallucinogen.  Therefore, the

---

webster.com/dictionary/narcotic (last visited 11/15/21).

court concludes that the drug exclusion does not apply.

## C. Attorneys' Fees and Costs

Federal Rule of Civil Procedure 54(d)(2)(A) provides, "A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages." Civil Local Rule 54-5(b) requires that "the motion for attorney fees must be supplemented by declarations or affidavits containing . . . [a] statement that counsel have met and conferred" regarding the motion, "or a statement that no conference was held, with certification that the applying attorney made a good faith effort to arrange such a conference." The civil local rules also require "[a] brief description of relevant qualifications and experience" and "the customary hourly charges" of persons for whose services fees are sought. Civ. L.R. 54-5(b).

Plaintiff has not filed a separate motion for attorneys' fees as required, let alone one that complies with the requirements of the local rules. Plaintiff has not yet established that she is entitled to an award of fees. Therefore, plaintiff's request for attorneys' fees is denied without prejudice to allow renewal in a procedurally proper motion.

## D. Prejudgment Interest

"A district court may award prejudgment interest on an award of ERISA benefits at its discretion." Blankenship v. Liberty Life Assur. Co. of Boston, 486 F.3d 620, 627 (9th Cir. 2007). "Prejudgment interest is an element of compensation, not a penalty." Dishman v. UNUM Life Ins. Co. of Am., 269 F.3d 974, 988 (9th Cir. 2001). "[T]he interest rate prescribed for post-judgment interest under 28 U.S.C. § 1961 is appropriate for fixing the rate of pre-judgment interest 'unless the trial judge finds, on substantial evidence, that the equities of that particular case require a different rate.'" Nelson v. EG & G Energy Measurements Grp., Inc., 37 F.3d 1384, 1392 (9th Cir. 1994) (quoting Western Pac. Fisheries, Inc. v. S.S. President Grant, 730 F.2d 1280, 1289 (9th Cir.1984)).

Here, as defendant notes, plaintiff does not make any showing as to why the court should deviate from the standard Treasury Bill rate. The default rate applies where there

is insufficient evidence to convince the court that the equities of this particular case require a different rate. Therefore, plaintiff shall be awarded prejudgment interest at the default rate specified in Title 28 U.S.C. § 1961.

### IV. CONCLUSION

Consistent with the findings of fact and conclusions of law set forth above, including that Chong's death was an accident and the Policy's drug exclusion does not apply, (1) plaintiff's motion for judgment is GRANTED, and (2) defendant's motion for judgment is DENIED.

**IT IS SO ORDERED.**

Dated: November 15, 2021

/s/ Phyllis J. Hamilton
PHYLLIS J. HAMILTON
United States District Judge